# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

VTP RIVER WOODS LLC,
And VTP A1 LP,

      Plaintiffs,

v.

CITY OF YPSILANTI,
a Michigan municipal corporation,
and JERRY DUNHAM.

      Defendants.

Case No. 24-cv-12646

Hon. Matthew F. Leitman
Mag. Judge Kimberly G. Altman

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

1

## SECOND AMENDED COMPLAINT

Plaintiffs VTP River Woods LLC, and VTP A1 LP (collectively "VTP") complain against defendants City of Ypsilanti ("City") and Jerry Dunham ("Dunham") (collectively referred to as "Defendants") as follows:

## PARTIES

1.     Plaintiff VTP River Woods LLC is a Delaware limited liability company that is registered to conduct business in Michigan.

2.     Plaintiff VTP A1 LP is a Delaware limited partnership that is registered to conduct business in Michigan.

3.     The City of Ypsilanti is a Michigan municipal corporation located in Washtenaw County, Michigan.

4.     Jerry Dunham, on information and belief is the City of Ypsilanti Building Department Manager and a resident of Washtenaw Count. On information and belief, Dunham has supervisory control over building inspections, issuance of citations, violation notices, and issuance of Certificates of Compliance ("COC") in the City of Ypsilanti, among other duties. In this complaint, Dunham is named in his individual capacity. Dunham was not acting in a purely ministerial capacity, but instead exercised discretionary authority in directing enforcement decisions, approving or denying COCs and Temporary Certificates of Compliance ("TCOC"), determining the scope and timing of inspections, and controlling the manner in

2

which violations were issued and enforced against VTP. At all relevant times, Dunham did not act as a neutral enforcer of the City's code. Instead, he personally directed and carried out a pattern of escalating, obstructive, and punitive enforcement actions against VTP that were not imposed on any other property. His actions were intentional, targeted, and undertaken with knowledge that they would interfere with VTP's operations, deprive it of the economic use of its property, and violation of VTP's clearly established constitutional rights. This pattern of conduct reflects personal animus and retaliatory motive and falls outside the scope of any legitimate governmental function, rendering Dunham individually liable for the resulting harm. Dunham's actions were a direct and proximate cause of the constitutional violations and damages alleged in this Complaint.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action under 28 U.S.C. § 1331 as this case involves a federal question under the Constitution and laws of the United States, including the Fifth and Fourteenth Amendments as well as 42 U.S.C. §1983.

6.      The Court has jurisdiction over this action under 28 U.S.C. § 1343(a)(3) and (4) because VTP seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

7.      Venue is proper in the Court pursuant to 28 U.S.C. § 1391 as all of the events giving rise to VTP's claims occurred in this district in Ypsilanti, Michigan.

8. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

9. Supplemental jurisdiction is appropriate because VTP's state law claims share a common nucleus of operative fact with their federal claims and the claims are most efficiently resolved together in one court.

## COMMON ALLEGATIONS

A. **VTP's Ownership and Proven Track Record of Lawful Operation and Compliance.**

10. VTP A1 LP acquired Arbor One North and South ("Arbor One") in or around August 2020, during the COVID-19 pandemic. **Exhibit 1 - Arbor One Deed**.

11. The 720 Green Road, 721 Green Road, 772 Green Road, 801 Green Road, 1431 Leforge Road, 1433 Leforge Road, 1423 Leforge Road, 1427 Leforge Road, 721 W. Clark Road, 725 Green Road, 791 Green Road, and 773 Green properties are located within, and operated as, Arbor One. **Exhibit 2 - Map of Properties.**

12. VTP River Woods LLC acquired the Arbor One West apartment community ("Arbor West") on May 13, 2022. **Exhibit 3 - Arbor West Deed**.

13. The 815 Green Road, 823 Green Road, 829 Green Road, 835 Green Road, 841 Green Road, 847 Green Road, and 853 Green Road properties are located within, and operated as, Arbor West. Ex. 2; Ex. 3.

14. Collectively, these properties operate as a large residential housing community within the City of Ypsilanti, consisting of multiple multi-unit apartment buildings and associated residential structures (the "Properties").

15. Certain townhome units within the broader community fall under the jurisdiction of Ypsilanti Township rather than the City of Ypsilanti.

16. VTP's business model is centered on long-term ownership, reinvestment, and maintaining habitable, compliant housing.

17. Across its portfolio, VTP has consistently operated in cooperation with local municipalities, maintained valid COCs, and resolved code-related issues through standard regulatory processes.

18. In particular, VTP owns and operates nineteen other residential apartment communities throughout Michigan, comprising more than 4,000 units. These communities are located in Southfield, Inkster, Farmington Hills, Rochester Hills, Lansing, Warren, Oak Park, Roseville, Allen Park, Grand Rapids, Dearborn Heights, and Westland.

19. Across its portfolio, VTP has developed a consistent and proven approach to acquiring and rehabilitating distressed properties. That approach includes early capital investment, stabilization of operations, identification of structural and code-related issues, and implementation of targeted improvements to enhance resident safety and quality of living.

20.     Consistent with this approach, VTP has a track record of working cooperatively with local municipalities, maintaining COCs, and resolving code-related issues through standard regulatory processes.

21.     Prior to the events described herein, VTP had not experienced the type of enforcement actions, regulatory instruction, or operational interference imposed by the City of Ypsilanti at any of its other properties.

22.     The circumstances at Arbor One and Arbor West are a clear outlier within VTP's otherwise consistent operational history and are the direct result of the City's conduct—not any departure from VTP's standard practices.

23.     Following the acquisition of the Properties, VTP retained LR Management to oversee operations. LR Management is one of the most experienced and diversified real estate management firms in Southeast Michigan. LR Management is comprised of a seasoned leadership team with extensive experience managing large residential portfolios and working with municipalities to maintain compliance and operational stability. Its operations are grounded in consistent, professional management practices focused on performance, compliance, and resident quality of life.

24.     LR Management manages thousands of residential units throughout the State of Michigan and has successfully partnered with VTP on multiple properties across its portfolio.

B.      **The City's COC Framework and Its Intended Operation.**

25.      The City regulates rental properties through Chapter 18, Article 6 of its Code of Ordinances ("Code"). **Exhibit 4**.

26.      Under Chapter 18, Article 6, Division 3 of the Code, VTP must have a valid Rental COCs before they can utilize the Properties as rentals. Ex. 4.

27.      For years, VTP leased the Properties as rental units under a COC issued by the City.

28.      Under the City's ordinance, COCs are valid for a defined period, typically two years.

29.      Based on the City's own records and timelines, the Properties were not due for recertification until approximately Spring 2025.

30.      Despite this, the City began subjecting the Properties to an unusual and excessive volume of inspections.

31.      These inspections were conducted outside of the City's typical practices and in a manner inconsistent with how similarly situated apartment complexes are treated.

32.      Under Chapter 18, Article 6, division 3 of the Code, the City permits the issuance of TCOCs. Ex. 4.

33.      Chapter 18, Article 6, division 3 of the Code provides in part, "[t]he temporary certificate shall state on its face any remaining violations to be corrected

7

and state that it will expire if such violations are not corrected within the time specified." Ex. 4.

### C. The City's Obstructive Conduct Disrupted Stabilization Efforts and Forced Management Turnover.

34.     During the first two years of LR Management's involvement at Arbor One, the property was stabilized and significantly improved. LR implemented operational and physical upgrades, increased occupancy to approximately 95% within a relatively short period of time, and restored the property to a stabilized and performing asset.

35.     That progress was disrupted when the City became increasingly involved in the COC process following COVID. What had historically been a routine certification process became prolonged, inconsistent, and unpredictable. The COC process at Arbor One following COVID extended far beyond the timelines and requirements LR Management had encountered at any other property, despite its extensive experience managing properties across the state.

36.     As the City's obstructive and burdensome enforcement practices escalated, the process became unworkable from a property management perspective. The shifting standards, lack of coordination, and prolonged delays made it increasingly difficult to effectively manage the Properties.

37.     Ultimately, as a direct result of the City's conduct, LR Management was forced to resign from its role at Arbor One. This outcome is highly unusual and

8

underscores the extent to which Defendants' actions deviated from standard regulatory practices and interfered with the normal operation and stabilization of the Properties.

### D. Unverified Complaints and Defendants' Refusal to Produce Evidence.

38. On or about August 12, 2024, City official, Joe Meyers, visited the Properties.

39. During the impromptu visit, Mr. Meyer's spoke with Amy Vujnov, Regional Project Manager of the Properties.

40. Mr. Meyers stated that the City had received multiple complaints regarding the Properties and further insinuated that the Properties are the most complained about properties in the City.

41. VTP had not previously been made aware of any such complaints.

42. Ms. Vujnov voiced her concerns regarding the existence of any complaints and requested copies of the complaints to ensure that the City could substantiate its claims and ensure that the City was properly and timely notifying VTP of any complaints.

43. The City refused to provide any documentation of the alleged complaints.

44. Ms. Vujnov requested a meeting with the City to address any concerns and ensure compliance.

9

45. VTP's attorney also contacted the City's Attorney to schedule a meeting to discuss these exact issues.

46. The City refused or ignored repeated requests to meet.

47. These requests were made in good faith and consistent with VTP's standard practice of working cooperatively with municipalities.

48. Without access to the alleged complaints, VTP was unable to evaluate, investigate, or address the issues being asserted by the City.

49. Upon information and belief, the City does not treat other property owners in this manner and routinely provides information or engages in dialogue when concerns are raised.

**E.    Defendants Launch a Coordinated, Property-Wide Enforcement in Retaliation for VTP's Protected Activity.**

41. Within days of Mr. Meyer's visit during which Ms. Vujnov questioned the City's ability to substantiate its claim that it received complaints pertaining to the Properties, Ms. Vujnov received by way of email, eighteen correction notices—one for each building at the Properties.

42. Notably, the eighteen correction notices pertain to exterior corrections only. **Exhibit 5 - Exterior Correction Notices**.

43. Prior to receiving the notices, VTP received no warning regarding the alleged violations or notice of exterior inspections by the City. Nor was there any request that VTP remedy the issues before the citations were issued.

44. All re-inspections were scheduled for the same date and time on September 17, 2024, at 9:00 am. Ex. 5.

45. This required VTP to simultaneously address alleged issues across every building in the community.

46. The City was aware of the burden this would impose.

47. Several notices contained date stamps indicating they had been generated weeks earlier but were not provided to VTP until much later. Ex. 5.

48. Prior to this event, VTP had not been subjected to simultaneous, property-wide enforcement of this magnitude.

49. Based on information and belief, the City has not provided similarly situated property owners with correction notices that were dated weeks before they were issued.

50. Based on information and belief, the City has not simultaneously issued large volumes of correction notices to similarly situated property owners and scheduled each of the re-inspections for the same re-inspection date.

51. Based on information and belief, no similarly situated property owner has been subjected to comparable enforcement of this magnitude, particularly for alleged exterior violations.

52. The timing, volume, and coordination of these notices demonstrate that the City's actions were not routine, but targeted.

**F.     The City's Exterior Correction Notices Fail to Provide Meaningful Notice of Alleged Violations.**

53.     The exterior correction notices issued by the City lacked sufficient detail to allow compliance. Ex. 5.

54.     The notices provide a "list of violations." However, the list provides no explanation as to where the alleged violations are located on the multi-unit buildings.

55.     For multi-unit buildings, this rendered the notices functionally unusable.

56.     By way of example, the correction notice for 721 Clark Road provides as one of the alleged violations "AC units damaged." Ex. 5.

57.     721 Clark Road is a multi-unit building, with twenty-four dwellings, and as such, there is an exterior AC unit for each of the twenty-four dwelling units. Ex. 5.

58.     Notably, the City's exterior correction notice fails to provide any notice as to which of the 24 AC units the City's is citing as damaged.

59.     Furthermore, the correction notice fails to provide any detail as to how the AC units are damaged.

60.     This is only one example of the multitude of vague violations cited within the eighteen exterior correction notices. Ex. 5.

12

61.     Additionally, while a portion of the notices provide reference to the Code, several Code sections are listed with no detail as to what is relevant to the particular violation. **Exhibit 6 - Formal Hearing Notices**.

62.     Despite the vague nature of the correction notices, VTP made every effort to retain a contractor to complete exterior repairs at the Properties.

63.     However, just like VTP, the professional contractors hired by VTP were unable to provide sufficient estimates for services because the notices were unclear as to exactly what needed to be corrected at the Properties.

64.     A respected Ann Arbor–based renovation and repair company, Wilderness Construction, was provided with the exterior correction orders issued by the City to assist in preparing a bid to complete the exterior work. In its bid, Wilderness Construction stated:

-**Wilderness is unable to put together a quote with a price until exact detail is given for each building specifically on what the city is looking to have done. Also cannot give a timeline as to how long project would take until all specifics/material needed are given to us for each building

**Exhibit 7 - Wilderness Construction's Bid**.

65.     VTP requested clarification and supporting documentation, including photographs from the City, specifically, Dunham.

66.     Dunham refused to provide such information despite acknowledging its existence.

67. The lack of specificity prevented VTP from timely curing the alleged violations and defending itself in subsequent hearings.

**G.   Defendants Refuse a Reasonable Extension Despite Known Burden.**

68. On September 4, 2024, VTP formally requested an extension of time to address the eighteen exterior correction notices. **Exhibit 8 - Request for Extension to Comply**.

69. The extension request was made in writing, and well in advance of the scheduled inspection date. Ex. 5.

70. The notices themselves lacked sufficient detail to allow immediate action. Ex. 5.

71. Given the sheer volume of properties to be inspected and the vagueness of the correction notices, additional time was necessary to obtain contractor evaluations and perform repairs.

72. The City was aware of the burden it placed on VTP by scheduling eighteen re-inspections for the same date.

73. Despite these circumstances, the extension request was denied by Dunham on September 5, 2024. Ex. 8.

74. Dunham claimed the denial was due to the absence of a meeting. However, VTP had repeatedly requested such a meeting, and the City refused to schedule one.

14

75. Citing the yet unscheduled meeting as the reason for denying the reinspection request was Dunham's thinly veiled excuse to continue the retaliatory campaign against VTP.

76. Defendants refused to comply with the extension request, despite the fact that the City has a history of granting extension requests for re-inspections. **Exhibit 9 - City Granting Request for Extension to Comply**.

77. The City's decision was not in the best interest of the public nor was it tied to any rational governmental interest.

78. Defendants should have ensured that VTP was afforded every opportunity to cure the alleged violations at the Properties.

79. The denial further demonstrates Defendants' intent to impose pressure rather than facilitate compliance.

## H. <u>The City Arbitrarily Suspends the Properties COCs Based on Exterior Conditions.</u>

80. On September 17, 2024, the City suspended VTP's COCs. **Exhibit 10 - COC Suspension Notice**.

81. The suspension occurred without meaningful pre-deprivation notice or an opportunity to be heard.

82. VTP was also denied the opportunity to obtain a TCOC. Though, if the City had scheduled the meeting VTP requested to have before re-inspection, it would

have learned that VTP had undertaken to correct such conditions as noted in the various violations.

83. Refusing to issue VTP a TCOC did not serve any rational governmental purpose, particularly where the alleged violations were all exterior violations.

84. The suspension immediately prevented VTP from lawfully leasing its units under the City's ordinance.

85. The suspension was not tied to any imminent safety threat requiring emergency action.

86. Upon information and belief, similarly situated properties have not been denied the opportunity to obtain a TCOC or denied the opportunity to schedule a re-certification inspection after the COC expired.

87. Upon information and belief, other property owners are routinely permitted to maintain operations during compliance periods.

88. The City's actions here were materially different.

89. To put it in perspective, the City's suspension made it so that VTP could not collect rent from hundreds of residents, throughout eighteen buildings for exterior violations, not for alleged violations that would impact tenant health and safety, but for items such as:

16











 

**Exhibit 11 - Exterior Correction Photos**

### I.   VTP Seeks Transparency -Triggering Escalation by Defendants.

90.   On September 25, 2024, VTP submitted a Freedom of Information Act ("FOIA") request seeking records regarding the City's enforcement practices. **Exhibit 12**.

91.   The request sought public records regarding the City's code enforcement and building department practices. Ex. 12.

92.   Additionally, the request sought public records regarding the City's treatment of similarly situated apartment complexes within the City, specifically about how the City handles the issuance of building citations, violations, and fines. Ex. 12.

19

93.     The public records sought would contribute significantly to the public's understanding of the City's governmental practices. Ex. 12.

94.     The City responded with a copying/production cost estimate exceeding $3,300.

95.     VTP objected to the estimate as unreasonable and requested clarification.

96.     As set forth in detail below, shortly after the FOIA request, Defendants intensified their enforcement actions against VTP.

97.     The timing of these actions reflects a direct connection between VTP's protected activity and Defendants' conduct.

**J.      Defendants Retaliate and Attempt to Silence VTP's Protected Activity.**

98.     After VTP requested clarifying information and submitted its FOIA request for information regarding the building department's practices and voiced concerns regarding the City's ability to substantiate claims pertaining to the Properties, City officials responded with hostility.

99.     Specifically, VTP contacted Dunham directly for clarification, requesting photographs or documentation supporting the cited violations in order to better understand the work that the City believed needed to be done.

100. Despite acknowledging the existence of the requested evidence, Dunham refused to provide any additional information or evidence to support the cited violations.

101. Instead, in response to VTP's good faith efforts to collect evidence regarding the alleged violations and formal hearing notices, Dunham told Arbor One's property manager to have its "Big Wig" attorneys request another FOIA for the pictures that would help VTP determine exactly what the City wanted VTP to address at the Properties.

102. Ms. Vujnov never mentioned VTP's FOIA request during her communications with Dunham.

103. Dunham's statements show that Defendants were punishing VTP for engaging in protected activity.

104. Dunham's comments were intended to silence VTP from future First Amendment activities, including filing legitimate FOIA requests with the City regarding its governmental practices and voicing concerns about the City's policies and practices.

105. Dunham's actions were also intended to interfere with VTP's ability to defend itself during the formal hearing process.

106.   Defendants have and continue to engage in a pattern and practice of targeting VTP, whereby VTP is subjected to adverse actions by Defendant in an attempt to silence and discourage VTP from future First Amendment activities.

## K.   VTP Initiates This Lawsuit Challenging the City's Conduct-The City's Conduct Escalates Further.

107.   On October 7, 2024, VTP filed its initial Complaint against the City in this matter.

108.   The City moved to dismiss the action as a matter of law, and that motion was denied by the Court.

109.   Following the filing of this action—and particularly after the Court denied the City's dispositive motion—the City's conduct toward VTP escalated in an increasingly aggressive and retaliatory manner.

## L.   The City Proceeds with Formal Hearings Using Backdated Violations and Limits VTP's Ability to Defend Itself.

110.   The City subsequently issued formal hearing notices related to the eighteen exterior correction notices. Ex. 6.

111.   Although the exterior correction notices were issued in September 2024, the City listed the violation offense dates as July 25, 2024. Ex. 6.

112.   This backdating deprived VTP of a fair opportunity to respond and created the appearance of prolonged noncompliance.

22

113.   This conduct was not an isolated incident. It marked the beginning of a broader pattern in which Defendants repeatedly relied on retroactive dating and other timing manipulations to prejudice VTP, mischaracterize the duration of alleged violations, and justify escalating enforcement actions.

114.   In the weeks following the issuance of the formal hearing notices, VTP continued to request meetings and clarification.

115.   The City continued to refuse or ignore those requests.

116.   It was not until six days before the formal hearings, on October 22, 2024, that the City finally provided limited documentation concerning the exterior violations.

117.   The City's refusal to provide the same until only a few days before the hearing substantially impacted VTP's ability to defend itself during the hearings.

### M.   Defendants Use Condemnation Threats as a Tool of Coercion Rather Than a Response to Legitimate Safety Concerns.

118.   On December 9, 2024, the City issued notices for eight buildings within the Properties, claiming they were unfit for human occupancy and threatening condemnation if repairs were not made by December 12, 2024.

119.   The notices cited alleged issues such as hallways and stairwells being under 68 degrees, unsecured doors, water damage, leaking pipes, presence of squatting, a leaking boiler, and visible mold in a utility room.

120. Even collectively, these alleged violations do not constitute "serious and imminent hazard to the health or safety of the occupants." MCL 125.532.

121. Counsel for VTP contacted the City attorneys almost immediately and requested that the City and VTP work together to find a better solution than the City's continued threats of condemnation for items that were not serious and imminent hazards, were duplicative, and reference violations that were not violations of applicable law.

122. Importantly, most of the cited issues were corrected by the December 12, 2024 deadline, and VTP provided the City with written confirmation of completed repairs and a detailed plan to address remaining items.

123. On December 12, 2024, the City reinspected the Properties and, notably, took no further action.

124. The issuance of condemnation notices and continued threats under these circumstances was punitive and unwarranted.

## N.   **Defendants Subject VTP to an Unprecedented Volume of Citations and Proceedings.**

125. During the relevant time period, the City issued hundreds of civil infraction notices related to the Properties.

126. VTP representatives were required to attend bi-weekly hearings before the City's Administrative Hearing Bureau ("AHB").

127.   More than 220 matters were placed on the City's AHB docket in 2025 alone.

128.   This volume of enforcement is unprecedented.

129.   On information and belief, no similarly situated property owner has been subjected to comparable enforcement.

130.   The process resulted in hundreds of thousands of dollars in punitive fines and costs.

## O.   Experienced Professionals Confirm the City Is Applying Disparate and Elevated Standards.

131.   In February 2025, VTP engaged a new property management company.

132.   The management team is highly experienced, with more than 20 years of experience in property management, including extensive work throughout the City of Ypsilanti and across more than 50 municipalities in Michigan. The management company is known for providing hands-on, proactive property management and has built a reputation for taking on challenging assets and successfully stabilizing and improving them.

133.   The management team has completed thousands of COC inspections involving properties in the City of Ypsilanti.

134.   Based on their decades of experience managing residential properties across Michigan—and their extensive work within the City of Ypsilanti—the new property management team observed that they were routinely required to obtain

25

permits for work that would not require permitting under standard industry practice or in other municipalities.

135. Drawing on their experience completing thousands of inspections, the management team further observed that inspection standards at the Properties were not only more stringent, but inconsistently applied, with requirements shifting between inspections and often without explanation.

136. Based on their direct involvement in inspections and remediation efforts at the Properties, the management team observed that Defendants disproportionately focused on minor, non-safety-related cosmetic conditions, using those items as a basis to fail inspections and delay certification, rather than prioritizing legitimate health and safety concerns.

137. Based on their experience managing comparable properties throughout the City and across the state, the management team observed that the time, cost, and effort required to complete identical work at the Properties was routinely double or triple what would be required elsewhere—directly as a result of Defendants' unusually burdensome, inconsistent, and elevated enforcement standards.

**P.** **The Stark Contrast Between City and Township Enforcement Confirms Arbitrary Treatment.**

138. The Arbor One community includes townhome units that fall under the jurisdiction of Ypsilanti Township, while the apartment buildings are regulated by the City.

26

139. These townhomes are part of the same overall development and are in immediate proximity to one another, in some cases directly across the street.

140. Although the properties share similar structure, age, and use—and are governed by the same code—the regulatory treatment in the two jurisdictions has been markedly different.

141. VTP was able to obtain COCs within Ypsilanti Township for the townhome portion of the community in a fraction of the time it was able to on the City side of the property.

142. That process at the townhomes has proceeded in a consistent, transparent, and cooperative manner.

143. Township officials have communicated clearly with VTP, provided reasonable guidance, and applied stable, predictable standards throughout the inspection and certification process.

144. The Township has not engaged in surprise inspections, mass enforcement actions, or the imposition of shifting or unclear requirements.

145. Nor has the Township withheld information necessary for VTP to understand or address alleged issues.

146. The difference is not merely procedural—it is substantive.

147. In one instance, VTP's contractor submitted permit materials to the Township consistent with the level of documentation the City has demanded.

148. Township officials responded by instructing VTP's contractors not to submit such materials, explaining that permits of that nature would not require that level of documentation.

149. This response highlights the excessive and atypical nature of the City's demands.

150. Under Township oversight, compliance has proceeded efficiently, with units moving through the certification process in a predictable and timely manner.

151. Under the City's oversight, the same process has been marked by delay, shifting standards, and repeated obstacles.

152. The fact that different portions of the same development—owned by the same entities and subject to the same general housing standards—are treated so differently by neighboring jurisdictions underscores that Defendants' conduct is not driven by legitimate code enforcement objectives.

153. As discussed above, VTP operates numerous residential communities across Michigan, including in Southfield, Inkster, Farmington Hills, Rochester Hills, Lansing, Warren, Oak Park, Roseville, Allen Park, Grand Rapids, Dearborn Heights, and Westland. Upon information and belief, those municipalities enforce the same or substantially similar housing and property maintenance codes. Yet, in each of those jurisdictions, VTP has been able to obtain and maintain COCs and address code-related issues through ordinary, cooperative processes, without being subjected

to the obstructive, overbroad, and burdensome requirements imposed by the City here.

154. The contrast demonstrates that Defendants have singled out the Properties for a level of scrutiny, burden, and enforcement that is not applied elsewhere.

## Q. Defendant Dunham Personally Directs a Pattern of Targeted, Retaliatory, and Adversarial Enforcement.

155. In addition to the City's broader enforcement campaign, Dunham began appearing at the Properties on an almost daily basis.

156. This level of presence and enforcement far exceeded any legitimate inspection activity and became increasingly adversarial.

157. On April 8, 2025, due to these repeated and uncoordinated entries, VTP's counsel sent formal notice to the City requiring that any further inspections be conducted pursuant to lawful authority, with advance written notice identifying the purpose and basis for entry. **Exhibit 13 - Cease and Desist Notice.**

158. VTP also requested that inspections be coordinated through proper channels and that an inspector other than Dunham be assigned to inspect the Properties to allow for a transparent and orderly process. Ex. 13.

159. Rather than adjust their conduct, Defendants escalated it.

29

160. The very next day, April 9, 2025, Defendant Dunham entered the Properties without prior notice, accompanied by a police escort, and issued red tags on every building at the Properties.

161. Each red tag required that all units be immediately vacated.

162. No inspection schedule had been communicated, and no coordination occurred with VTP or its management.

163. The timing and scope of this action—occurring one day after VTP formally objected to Dunham's conduct in writing—reflects retaliatory intent.

164. Dunham's conduct toward the Properties is not merely overzealous—it is personal. Dunham has singled out the Properties and subjected them to a level of scrutiny, obstruction, and escalating enforcement that has not been applied to any other property in the City.

165. This treatment was so pronounced that it was readily apparent to property management, contractors, and others involved in the process that the Properties were being treated differently.

166. The consistency and intensity of Dunham's actions reflect a targeted and intentional course of conduct, rather than any legitimate or neutral application of the City's code enforcement authority.

167. Defendants' actions are consistent with a pattern of punitive and targeted enforcement directed at VTP.[1]

168. At all relevant times, the constitutional rights violated by Defendants were clearly established such that a reasonable official in Dunham's position would have known that the conduct described herein was unlawful.

169. It has long been clearly established that:

a. Government officials may not retaliate against an individual or entity for engaging in protected First Amendment activity, including filing lawsuits, voicing concerns regarding City policies and practices or requesting public records;

b. Government officials may not intentionally interfere with property rights or business operations through arbitrary or irrational enforcement actions lacking a legitimate governmental purpose;

c. The Due Process Clause prohibits the arbitrary and capricious exercise of governmental power, including enforcement actions that are not rationally related to a legitimate public health, safety, or welfare objective; and

d. Government officials may not deprive a property owner of the use of its property through enforcement mechanisms that are intentionally structured to make compliance unattainable or to impose punishment rather than achieve compliance.

---

[1] VTP initially revoked consent for Defendant Dunham to enter the Properties due to his conduct. However, the City effectively refused to move the inspection process forward through any other inspector, leaving Dunham as the sole avenue for continued inspections. This placed VTP in the untenable position of either halting inspections altogether—thereby delaying compliance and prolonging enforcement—or permitting Dunham to return and proceed under his direction. In order to continue making progress toward compliance, VTP allowed Dunham to resume inspections despite the ongoing issues described herein.

170. These principles were clearly established by precedent from the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit at the time of Defendants' conduct.

171. In light of this clearly established law, it would have been apparent to any reasonable official in Dunham's position that directing or participating in a pattern of enforcement actions designed to prevent lawful leasing, eliminate rental income, obstruct compliance, and target VTP in retaliation for protected activity was unconstitutional.

**R.** **Defendants Impose Overbroad Red Tags Affecting Entire Buildings Without Justification.**

172. As set forth above, Defendants issued a series of red tag notices, vacate orders and enforcement decisions affecting numerous buildings within the Properties.

173. These enforcement actions continued throughout March and into April 2025.

174. In total, approximately thirty separate determinations were issued by Defendants affecting buildings across the Properties.

175. Each of these determinations declared the affected buildings to be: (a) unsafe or unfit for human occupancy; (b) dangerous; and (c) subject to immediate vacate orders requiring all tenants to leave.

32

176. Defendants' actions were sweeping in scope. Rather than identifying specific units or localized conditions, Defendants applied these determinations broadly to entire buildings, regardless of the condition of individual units.

177. Defendants did not limit the orders to specific units, floors, or areas where issues may have existed, they did not establish compliance timelines or allow for phased remediation, and they did not consider or implement less disruptive alternatives that would have protected tenants while allowing necessary work to proceed.

178. Defendants also failed to provide evidence demonstrating that the conditions were so severe and imminent that full building vacate orders were the only viable option.

179. The absence of such evidence is particularly significant given that many of the same buildings had recently passed inspection and had been certified for occupancy less than two years prior.

180. Defendants' abrupt reversal—declaring entire buildings unsafe within a short timeframe—defies any reasonable inference that conditions had deteriorated so drastically as to justify immediate displacement.

181. Defendants' actions sought to force the mass relocation of tenants, disrupted housing stability, and imposed substantial financial and operational burdens on VTP.

33

182. These consequences were not the result of measured regulatory enforcement, but of overbroad, punitive, and unsupported determinations.

183. The manner, timing, and scope of these red tag actions further reflect a continuation of Defendants' broader pattern of targeting VTP through aggressive and unequal enforcement measures.

### S.   **Defendants Obstructs Compliance Through Shifting, Inconsistent, and Escalating Requirements.**

184. Throughout the COC reinspection process, Defendants have not facilitated compliance—they have obstructed it.

185. Defendants have imposed a constantly shifting, increasingly onerous set of requirements that go far beyond any standard application of housing or building codes, resulting in delay, increased cost, and prolonged vacancy across the Properties.

186. Unlike similarly situated properties, the Properties have been subjected to inconsistent, elevated, and evolving inspection and permitting standards that have made efficient remediation impossible.

187. Inspection outcomes have varied without clear justification, leading to repeated cycles of correction and reinspection.

188. This is not merely VTP's characterization. It has been confirmed by witness testimony, industry professionals, and the courts.

189.   At a July 10, 2025 evidentiary hearing, a project manager responsible for hundreds of properties in the City of Ypsilanti testified that Arbor One was being subjected to more burdensome requirements than any other property under his management.

190.   Similarly, an environmental expert with decades of experience testified that he had never seen a municipality require the type of property-wide air quality testing demanded by the City in this case.

191.   The judiciary has also recognized the problem. One District Court Judge described the City's conduct as "petty," while another Circuit Court Judge questioned whether the City was capable of administering the process in a fair and efficient manner and suggested the need for a neutral third-party inspector.

192.   Defendants' obstruction is evident in its day-to-day conduct.

193.   In May 2025, when VTP's management team requested coordination to manage the thousands of inspections required, Defendants refused, stating that inspectors would not coordinate access and that such cooperation was merely a "courtesy."

194.   In April 2025, Dunham threatened enforcement over a single open window—an issue that could have been resolved immediately through basic communication—demonstrating a preference for punitive action over practical resolution.

35

195.  Defendants repeatedly imposed costly and unnecessary requirements without regard to proportionality or necessity.

196.  For example, Defendants required the replacement of boilerplate covers across multiple buildings, even where the issues were purely cosmetic.

197.  VTP advised Defendants that this requirement would impose significant cost without any corresponding safety benefit.

198.  Defendants nonetheless required full replacement, demonstrating an indifference to cost and a disregard for practical remediation.

199.  Defendants have also refused to utilize available mechanisms that would have allowed the project to move forward. The City's ordinance expressly permits the issuance of TCOCs, which would have allowed portions of the property to remain occupied, preserve rental income, and support ongoing remediation.

200.  Instead, the City took the position that it does not issue TCOCs at all, and in or around June 2025, Dunham further confirmed that no TCOCs would be issued for Arbor One under any circumstances. This refusal eliminated a viable path for phased compliance, forced full vacancy, and unnecessarily delayed progress at the property.

201.  Defendants maintained this position unless and until ordered otherwise by a court.

202. Had TCOCs been issued, VTP's damages could have been mitigated by allowing units with no alleged health and safety violations to be occupied while remaining work was completed.

203. Instead, Defendants used their refusal as a tool to prolong vacancy and increase financial pressure.

204. Defendants' obstruction is further reflected in their repeated movement of the goalposts during inspections.

205. Defendants would conduct an inspection, provide a list of required corrections, and VTP would complete those items.

206. Upon reinspection, rather than confirming compliance, Defendants would add new items that had not previously been identified.

207. This cycle repeated continuously, making it effectively impossible to pass inspections.

208. In April 2025, this issue was raised directly with City leadership, including the City Manager Andrew Hellenga, Dunham, and Community Services Director Joe Meyers.

209. Despite these concerns being raised, Defendants took no action to correct this practice.

210. In fact, the following month, May 2025, Dunham conducted an inspection and added approximately 120 new items that had not been previously identified to the original correction order.

211. This practice ensured that inspections would continue to fail regardless of the work completed.

212. The practical effect is obvious: in any occupied multi-unit building, new minor issues will always exist, meaning that if inspectors are permitted to continuously add new items, a property could never achieve a passing inspection.

213. Defendants' conduct therefore created a process in which compliance was structurally unattainable.

214. Specific examples further illustrate this pattern. At 721 W. Clark, Defendants initially required drywall patching in common areas, which VTP completed.

215. Upon reinspection, Defendants then required full repainting of the same areas, resulting in more than $12,000 in additional costs.

216. After repainting was completed, Defendants again failed the inspection based on minor "paint runs" above a door—an issue unrelated to the prior work and wholly disproportionate as a basis to fail the entire inspection.



**Exhibit 14 - Paint Run Photos**.

217. In another instance, Defendants failed an inspection because drywall had not yet been primed, despite the fact that drying conditions were affected by tenant occupancy.

218. When VTP offered to provide proof of completion within minutes, Dunham refused, choosing instead to fail the inspection.

219. Defendants have also imposed inconsistent and arbitrary permitting requirements.

220. Initially, permits were issued without accompanying architectural or otherwise descriptive drawings.

221. Defendants then unilaterally changed the requirement for the Properties and began requiring sketches of intended work.

222. Defendants then abruptly began requiring stamped architectural drawings for routine work, which in practice required VTP to retain a licensed

39

architect for each individual permit—an expensive and time-consuming requirement. This was particularly onerous and unnecessary given that, for months, the City had issued permits for the same work based on sketches or no drawings at all.

223. In March 2025, the City began rejecting permit applications based on disagreement with VTP's cost estimates, effectively requiring VTP to increase its projected costs in order to obtain permits.

224. The City would also approve a permit for a particular scope of work, only to deny a subsequent permit for the same or materially identical work submitted shortly thereafter. These reversals occurred without any change in the underlying code, scope, or conditions at the Properties, and without any meaningful explanation.

225. These inconsistent and shifting requirements made it increasingly difficult to obtain permits necessary to perform required work. By changing the rules mid-process, the City ensured that compliance remained a moving target, rather than an attainable endpoint.

226. Defendants further obstructed the process by withholding standard inspection documentation.

227. Historically, Defendants provided inspection cards following inspections reflecting pass/fail results.

228. In May 2025, Defendants began refusing to provide these cards.

229. This prevented VTP from verifying inspection outcomes and created additional confusion and delay in tracking compliance progress.

230. Defendants also failed units for trivial, non-safety-related conditions while prohibiting occupancy and rent collection.

231. Units were failed for items such as towel bar repairs, toilet tank lid issues, basic housekeeping , closet door paint, hallway paint imperfections, and minor flooring issues.

232. These types of issues do not present any legitimate health or safety risk, yet, were used as a basis to deny occupancy and prolong vacancy.

233. Defendants' obstruction is further evidenced by the inconsistency in how City inspectors applied standards.

234. On the limited occasions when inspectors other than Defendant Dunham conducted inspections, they acknowledged that the requirements being enforced were not typical.

235. Inspectors would identify minor or otherwise non-citable conditions and explain that "this is what Jerry wants," indicating that the standards were being driven by Dunham's hostile directives rather than uniform enforcement.

236. This dynamic made inspections unpredictable and prevented VTP from relying on any consistent standard for compliance.

41

237. Taken together, these actions demonstrate a consistent pattern: when VTP attempted to comply, Defendants changed the rules; when VTP completed work, Defendants imposed new requirements; and when VTP sought coordination, Defendants refused.

238. The result is a process in which compliance is not merely difficult—it is intentionally obstructed.

**T.** **Defendants' Internal Communications Establish Bias, Hostility, and Intentional, Non-Neutral Enforcement.**

239. Defendants have not treated the Properties as a routine code enforcement matter. Instead, they have approached the Properties as a target of heightened scrutiny and adversarial enforcement.

240. This is not inferred from outcomes alone—it is reflected directly in Defendants' own internal communications.

241. Communications among City personnel reveal overt hostility toward Arbor One and its remediation efforts, as well as a mindset inconsistent with neutral regulatory oversight.

242. In response to VTP pulling permits and attempting to advance repairs, City personnel made statements reflecting resistance to progress rather than cooperation in achieving compliance.

243. Other communications directed Building Department staff to block members of VTP's property management team when they attempted to discuss re-

42

inspections or coordinate access, effectively shutting down ordinary channels of communication necessary to move the project forward. Rather than facilitating compliance, Defendants intentionally limited VTP's ability to engage with inspectors and resolve issues in real time.



**Exhibit 15 - City Communications**.

244.    Internal communications further demonstrate a focus on punitive escalation rather than efficient resolution.

245.   City personnel joked about issuing lengthy violation lists, including comments about presenting more than one hundred alleged violations at a time.



Ex. 15.

246.   These remarks reflect an enforcement approach driven by volume and pressure, not by targeted remediation of legitimate safety concerns.

247.   The same communications also confirm that City officials were aware they were applying an unusually strict level of scrutiny to Arbor One.

248.   In some instances, staff explicitly acknowledged that inspections were being conducted in a more "picky" manner than normal.



Ex. 15.

249.   Defendants also implemented Arbor One-specific internal directives governing how permit applications were to be handled.

250.   The existence of such property-specific instructions demonstrates that the Properties were not being treated under the same standards applied to other properties.

45

To:          Cathy Hall
Cc:          Joe Meyers
Subject:     Arbor One plans
Date:        Monday, May 5, 2025 12:04:30 PM

Cathy,

Permit applications for Arbor One need both of the following:

**Description of Work**
The plan review submission shall give a complete description of the work to be performed.
**Construction Documents**
The construction documents shall indicate the size, shape, and height of all features of the buildings and structures of the project. Specific information shall be given to establish the quality and requirements of the construction for compliance with the code. The information may be submitted in any combination of written and graphic material. The codes shall not be cited, or the term "legal" or similar shall not be used in place of specific information. All construction documents shall be sealed and signed by an architect or professional engineer licensed in Michigan in accordance with 1980 PA 299, as amended.

If they unsure of the work they are going to do in unit, they can pull a demo permit.

Thanks

Jerry Dunham II
Building Official/Building Department Manager
City of Ypsilanti
JDunham@cityofypsilanti.com
734-482-1025
www.cityofypsilanti.com



Ex. 15.

251. If the Properties were subject to neutral enforcement, no separate internal handling protocol would have been necessary.

252. The record further reflects that City officials' conduct toward VTP representatives crossed the line from strict enforcement into adversarial behavior.

253. Property management staff attempting to explain ongoing remediation efforts reported being subjected to hostile interactions to the point of being reduced to tears.

46



Ex. 15.

254.   These interactions are inconsistent with any good-faith regulatory process and instead reflect an environment of intimidation and obstruction.

255.   Defendants' communications also include inappropriate and biased remarks unrelated to any code enforcement purpose.

256.   In one instance, City personnel referred to a property representative as "the guy in the yamaka," singling out the individual based on a visible marker of his Jewish faith.

47



Ex. 15.

257. This comment serves no legitimate enforcement purpose and reflects a casual, dismissive attitude toward VTP's ownership and management.

258. Such statements support an inference that bias, including religious bias, influenced Defendants' treatment of Arbor One.

259. Internal communications further reveal that concerns regarding Defendants' conduct were recognized even within City leadership.

260. In one example, a City Commissioner identified issues with enforcement actions, including a red-tag issued without inspection of individual units and prior inaccurate assertions regarding conditions at the Properties.

| From: | Anne Somerville |
|---|---|
| To: | Wilcoxen, Steve; Patrick McLean; Brown, Nicole |
| Subject: | Arbor One Building 849 |
| Date: | Saturday, March 8, 2025 3:53:39 PM |

**Attention:** This email was sent to the City of Ypsilanti from an *external source.* Please be extra vigilant when opening attachments or clicking links.

Good afternoon all,

I went out to Arbor One today to canvass. I want to flag that building 849 had a red tag but the two residents I talked to seemed confused and indicated to me that they didn't have any issues in their units.

In unit #203, the residents indicated that the city building department did not inspect the unit before posting the condemnation notice on the entire building.

I gave both tenants the legal services flyer but thought this was worth flagging for you. It reminds me of an experience in December when staff said all of the units where without heat and that turned out not to be accurate.

Details on the units:

Building 849 #203
Name: Chris
734-897-8009
Surprised about red tagged because no issues. Confused but moving anyways.

Building 849 #102
Name: Kay
734-209-8670
No issues in unit but building has a red tag. Tenant was confused on if they needed to move. I explained that the red tag means you need to vacate and encourage her to look at the flyer.

Ex. 15.

261. This acknowledgment demonstrates that Defendants were aware of potential overreach and factual inaccuracies but continued their enforcement approach regardless.

262. In another example, a City official expressed concern that the City's actions would result in the mass displacement of residents, noting that there were

insufficient housing resources available to accommodate the number of affected tenants and that such actions risked leaving residents without shelter. Ex. 15.

263. Importantly, the City Official recognized that the City had alternative enforcement tools available under applicable law, including measures short of red-tagging. Despite these warnings and the availability of alternative approaches, Defendants proceeded with an enforcement strategy that prioritized broad displacement over targeted remediation. Ex. 15.

264. Additional communications show the Defendants' unwillingness to engage in cooperative problem-solving, even when presented with the scale and complexity of the project.

265. When VTP's management team emphasized that thousands of inspections would be required and requested coordination to facilitate access and efficiency, Defendants' response was dismissive.

266. Dunham stated that inspectors would not coordinate access or communicate in advance, characterizing such basic cooperation as a "courtesy" rather than a necessary component of the process. Ex. 15.

267. This refusal to coordinate made it significantly more difficult to complete inspections and advance remediation.

268. The City has also engaged in conduct that is punitive in nature, including declining to accept timely fine payments while simultaneously imposing late fees.

269. This type of conduct serves no regulatory purpose and instead increases financial pressure on VTP.

270. Taken together, Defendants' communications and conduct demonstrate that the challenges faced by VTP are not the result of ordinary regulatory disagreement.

271. Rather, they reflect a consistent pattern of bias, hostility, and adversarial enforcement directed specifically at the Properties.

272. This pattern undermines any claim that Defendants' actions were neutral, objective, or motivated solely by legitimate health and safety concerns.

273. Instead, the record shows that Defendants approached the Properties with a preconceived adversarial posture and carried that posture through every stage of the enforcement process.

274. Defendants' adversarial conduct has extended beyond the Properties themselves to individuals and entities associated with the Properties.

275. In or around July 2025, Dunham told members of the property management team that if they set foot on Arbor West again, the police would be

called, they would be criminally trespassed, and the City would pursue prosecution against them.

276. At that time, although a receiver had been appointed over certain portions of Arbor West, the property manager remained actively involved in managing the Properties and addressing compliance issues.

277. Dunham's statements effectively threatened criminal enforcement against the very individuals responsible for carrying out the remediation work required by the City.

278. Such threats are not consistent with legitimate code enforcement. They are coercive, punitive, and designed to interfere with VTP's ability to manage and remediate its own Properties.

279. This conduct further underscores Defendants' pattern of hostility and its willingness to escalate beyond regulatory enforcement into intimidation of VTP's personnel and agents.

## U. **Defendants' Conduct Reflects a Coordinated Effort to Drive the Properties Out of Operation.**

280. From the outset of its enforcement efforts, Defendants persistently took the position that the Properties, in their entirety, were unfit for human occupancy.

281. Despite that position, Defendants did not take meaningful steps to require that all tenants vacate the Properties or otherwise ensure that the units were no longer occupied.

282. Instead, tenants continued to reside at the Properties under their existing lease agreements throughout the relevant period.

283. During that same time, the City took steps to ensure that tenants would not pay rent to VTP while remaining in possession of their units.

284. Defendants were aware that rental income from those tenants was a primary source of funds used to operate, maintain, and repair the Properties.

285. As a result of Defendants' actions, tenants continued to occupy the Properties, but the Properties generated little to no revenue.

286. At the same time, Defendants continued to issue violations, impose fines, and demand that VTP complete repairs and maintenance work.

287. Defendants were aware that, without rental income, VTP lacked the financial ability to perform the work being required.

288. The timing and sequence of Defendants' actions created a sustained period during which the Properties remained occupied but were effectively prevented from generating income.

289. This approach placed VTP in a position where it was expected to fund ongoing operations and complete substantial repairs without any corresponding revenue.

290. The combined effect of these actions was to strip the Properties of its income while simultaneously increasing VTP's financial obligations.

53

291. Defendants' conduct resulted in mounting financial pressure on the Properties and impaired VTP's ability to continue operating it.

292. Defendants' conduct has not only harmed VTP, but has also directly harmed tenants and the broader Ypsilanti community. VTP provides residential housing, and the continued operation of the Properties directly impacts the availability of safe and stable housing for City residents.

293. Rather than facilitating the restoration and stabilization of habitable units, Defendants' actions reduced available housing, forced unnecessary tenant displacement, and prolonged vacancy across the Properties. In doing so, Defendants acted contrary to the purpose of the City's housing and code enforcement framework, undermining—not advancing—the availability of safe and stable housing within the City.

## V. **VTP Demonstrates Ongoing Compliance Efforts in the Face of Constant Interference.**

294. Despite Defendants' obstructive conduct and shifting enforcement standards, VTP has undertaken substantial and sustained efforts to remediate the Properties and bring units back into compliance.

295. VTP has worked to obtain millions of dollars private capital to invest into repairs, remediation, and compliance-related work across the Properties.

296. These efforts have included extensive building repairs, system upgrades, environmental remediation, and ongoing maintenance work necessary to meet Defendants' onerous requirements.

297. VTP's property management team and retained contractors have collectively devoted tens of thousands of labor hours to this effort.

298. In addition to physical remediation, VTP has navigated an unprecedented volume of administrative requirements, including permit applications, inspections, and formal hearings.

299. VTP has successfully passed hundreds of inspections throughout this process.

300. As a result of these efforts, VTP has obtained COCs for three buildings at Arbor One as of the date of filing this Second Amended Complaint.

301. These accomplishments demonstrate that VTP has both the ability and the willingness to complete the work necessary to bring units back online and into compliance.

302. They also confirm that the Properties can meet applicable standards when those standards are applied consistently and fairly.

303. While litigation has contributed to some delay, the record reflects that a significant portion of the delay is attributable to Defendants' inconsistent enforcement practices and lack of coordination.

55

304. The combination of prolonged timelines, increased costs, and repeated rework has significantly burdened VTP's ability to efficiently restore the Properties to full operation.

305. Nonetheless, VTP has continued to make measurable progress despite these challenges, underscoring that the primary barrier to completion has not been VTP's efforts, but Defendants' administration of the process.

**W. Defendants' Retroactive Backdating of COCs Further Demonstrates Disparate and Irrational Enforcement.**

306. In or around February 2026, after VTP undertook substantial remediation efforts and incurred significant expense to bring certain buildings into compliance, Defendants issued COCs for three buildings at Arbor One, 721 W. Clark, 720 Green, and 721/723 Green. **Exhibit 16** – February 2026 COCs.

307. Despite issuing those COCs in February 2026—based on a present determination that the buildings satisfied applicable health and safety standards—Defendants assigned a retroactive certification period beginning in or around October 2024.

308. This retroactive backdating bears no relationship to when compliance was actually achieved, when inspections confirming compliance occurred, or when the COCs were issued.

309. Upon information and belief, Defendants do not apply this practice to similarly situated properties and do not routinely issue COCs with retroactive effective dates that substantially predate the inspection and certification process.

310. The backdating of the COCs creates an arbitrary and materially shortened certification period, effectively requiring VTP to re-enter the inspection and certification process within months of achieving compliance.

311. This treatment is inconsistent with the City's own COC framework, which is intended to reflect a current determination that a property is safe, healthful, and fit for occupancy at the time of issuance—not to retroactively assign compliance to a prior period.

312. Defendants' conduct is also internally inconsistent. Throughout this litigation, Defendants have taken the position that the Properties lacked valid COCs during the same period now designated as part of the retroactive certification window.

313. Based on Defendants' position that the Properties lacked valid COCs, VTP was required to cease rent collection, return rent, incur substantial relocation costs, and operate under significant court-imposed restrictions.

314. Defendants now seek to treat that same time period as part of a valid certification cycle, demonstrating a selective and outcome-driven application of the City's code enforcement authority.

57

315. The practical effect of Defendants' backdating is to impose duplicative regulatory burdens on VTP, including accelerated reinspection requirements, additional permitting and compliance costs, and continued operational instability.

316. This approach directly undermines VTP's efforts to stabilize the Properties and bring units back online in a safe and compliant condition.

317. Defendants' actions also harm tenants by subjecting occupied units to repeated and unnecessary inspection cycles within short intervals, causing disruption without any corresponding health or safety benefit.

318. More broadly, Defendants' conduct impedes the restoration of housing at the Properties by delaying the ability to maintain stabilized, income-producing units and diverting resources away from meaningful remediation efforts.

319. In a market with limited available housing, Defendants' actions reduce the effective housing supply by prolonging vacancy, delaying unit turnover, and creating uncertainty in the certification process.

320. Rather than facilitating the return of safe, habitable housing to the community, Defendants' backdating of the COCs imposes artificial barriers that delay progress and exacerbate housing constraints.

321. Defendants' decision to retroactively backdate the COCs is arbitrary, irrational, and not tied to any legitimate governmental objective, and further reflects the pattern of disparate and targeted enforcement imposed on VTP.

58

### X.   Defendants' Conduct Has Caused Catastrophic, Ongoing Financial Harm and Has Rendered the Properties Financially Distressed.

322.   As a direct and proximate result of Defendants' conduct, VTP has suffered substantial and ongoing damages.

323.   VTP invested approximately $70–80 million to acquire the Properties with the expectation that they would operate as income-generating residential assets.

324.   Defendants' actions have effectively shut down VTP's ability to operate the Properties as income-generating assets. By suspending COCs, prohibiting rent collection, and delaying re-certification through shifting and inconsistent requirements, Defendants have eliminated the Properties' primary revenue stream.

325.   At the same time, VTP has been required to continue funding extensive remediation efforts, operational costs, and compliance-related expenses.

326.   VTP has invested millions of dollars into repairs, environmental remediation, permitting, inspections, and related work in an effort to comply with Defendants' burdensome demands.

327.   In addition to these direct costs, VTP has incurred substantial expenses associated with tenant relocation, including payments made to facilitate move-outs from units that were otherwise safe and ready for occupancy but could not be lawfully leased due to Defendants' refusal to issue COCs.

328.   Defendants' actions have also resulted in the imposition of fines, fees, and penalties, further compounding VTP's financial burden.

329. At the same time, the City has interfered with VTP's ability to manage these obligations by declining to accept payments in certain instances while imposing additional charges.

330. The combination of lost revenue and escalating costs has created a severe and unsustainable financial imbalance.

331. As a result of this imbalance, VTP has been unable to service its debt obligations, and portions of the Properties are now subject to receivership and face the imminent risk of foreclosure.

332. The Properties, which were previously viable and income-producing, have been rendered financially distressed as a direct result of Defendants' conduct.

333. This imbalance has deprived VTP of the economic benefit of its ownership and has significantly diminished the value of its assets.

334. Defendants' actions have also caused collateral financial harm, including damage to VTP's business relationships, increased financing pressures, and the loss of expected returns on investment.

335. As a result of these combined factors, the financial condition of the entities that own and operate the Properties has been severely compromised.

336. Defendants' conduct has placed these entities in a position where they are unable to meet ordinary financial obligations without continued capital infusion,

despite the Properties being capable of generating revenue under normal regulatory conditions.

337. In practical terms, Defendants' actions have pushed VTP to insolvency.

338. These damages are ongoing and continue to accrue as Defendants maintain their current enforcement posture and delay the restoration of lawful operations.

**COUNT I – DENIAL OF EQUAL PROTECTION BASED ON SELECTIVE ENFORCEMENT OF THE YPSILANTI CITY CODE – 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)**

339. VTP incorporates the preceding allegations as if fully set forth herein.

340. The Equal Protection Clause prohibits state action that discriminates on the basis of membership in a protected class or that irrationally targets an individual for discriminatory treatment as a so-called "class of one."

341. As set forth above, Defendants have selectively enforced the Ypsilanti City Code against VTP, in a manner that differs from its enforcement of the Code against other similarly situated properties and their property owners. Upon information and belief, these properties include, but are not limited to, the Red Lion, River Drive Apartments, Covington Apartment, Washington Apartments, 1175 Cornell Rd, Tower Apartments, 712 Washtenaw Ave, 509 W. Forest Ave, Flo-Mar Apartments, 211 Washington Street Apartment, 404 Forest, and Hamilton Crossing.

342. Upon information and belief, each of these properties represent similarly situated apartment complexes located within the City.

343. Defendants' discriminatory treatment of VTP was intentional, malicious, and undertaken in bad faith. As set forth in the Common Allegations, the Defendants imposed enforcement measures on VTP that are not imposed on similarly situated property owners, including but not limited to, issuing mass, simultaneous correction notices across all buildings; refusing to provide supporting documentation or photographs of alleged violations; denying reasonable extensions routinely granted to other property owners; refusing to issue TCOCs; imposing shifting, inconsistent, and heightened inspection and permitting requirements; and preventing VTP from leasing units while other similarly situated properties continued operating.

344. Defendants further engaged in disparate treatment by retroactively backdating COCs in a manner not applied to similarly situated properties, thereby imposing shortened certification periods, duplicative regulatory burdens, and additional costs on VTP without any rational basis.

345. Additionally, the contrast between the City's treatment of the Properties and Ypsilanti Township's treatment of the townhomes demonstrates that the City's actions were not based on legitimate regulatory objectives.

346. Internal communications among City officials reflect hostility toward VTP and confirm that the Properties were subjected to a more "picky," burdensome, and adversarial level of scrutiny than other properties.

347. Defendants' enforcement actions were not merely inconsistent—they were intentionally structured to prevent compliance by continuously changing requirements, adding new violations during re-inspections, and withholding necessary information.

348. As evidenced by the deliberate conduct of City officials with final decision-making authority, including Dunham as well as Joe Meyers, the City has selectively enforced the Ypsilanti City Code against VTP while affording materially different treatment to similarly situated property owners.

349. By way of example, Dunham and Meyers have been directly involved in the enforcement of the City Code against other multi-unit residential properties within the City that have been permitted to, among other things, continue leasing their properties and collect rent despite the City's knowledge of alleged code violations; obtain TCOCs after expiration of prior COCs; receive advance notice of inspections; obtain extensions for inspection and reinspection deadlines; and receive sufficiently detailed correction notices and supporting documentation necessary to timely cure alleged violations and meaningfully defend against enforcement actions.

350. In contrast, VTP was denied each of these and instead subjected to coordinated, simultaneous, and burdensome enforcement actions, including vague and unsupported correction notices, denial of extensions, refusal to provide documentation, and arbitrary suspension of its ability to lease its Properties.

351. The disparate treatment was not accidental or the result of ordinary administrative variation. It was intentional and directed by City officials who were personally involved in both (a) the enforcement actions taken against VTP and (b) the more favorable treatment afforded to similarly situated properties.

352. Defendants' conduct further reflects a failure to adequately train and supervise Building Department personnel. These failures extended beyond isolated deficiencies and included, among other things, the City's failure to train and supervise personnel to apply consistent inspection standards, provide specific and actionable violation notices, limit re-inspections to identified deficiencies, and distinguish between life-safety concerns and minor conditions.

353. The City also failed to train personnel on the proper application of permitting requirements, resulting in shifting and inconsistent demands, as well as the proper use of TCOCs as expressly permitted under the ordinance. Additionally, the City failed to train personnel to provide timely documentation, disclose evidence prior to hearings, coordinate inspections in large multi-building properties, and facilitate compliance through reasonable communication.

354. Rather than correct these deficiencies, the City allowed and ratified these practices, permitting personnel to apply shifting and inconsistent standards that made compliance unattainable. This pattern of inaction and ratification demonstrates deliberate indifference and reflects an informal policy or custom of enforcement that directly caused the injuries suffered by VTP.

355. These failures are not isolated incidents, but instead reflect a broader policy, practice, or custom of the City, including a tolerance for conduct that deprives property owners—specifically VTP—of their constitutional right to equal protection.

356. Defendants' persistent and deliberate actions constitute a custom or practice of selective enforcement carried out under color of state law and ratified by officials with final decision-making authority, including but not limited to, Joe Meyers, Jerry Dunham, and Andrew Hellanga,

357. There was no rational basis for disparate treatment of VTP. Rather, their actions were motivated by animus, retaliation, and an intent to impose financial and operational harm.

358. Defendants' custom of selectively enforcing the Ypsilanti City Code against VTP has been a moving force behind VTP's injuries.

359.   Defendants' selective enforcement of the Code has caused irreparable harm to VTP and violated its right to equal protection under the Fourteenth Amendment to the United States Constitution.

360.   No reasonable official in Defendants' position could have believed that the conduct described herein was lawful. Preventing a property owner from leasing units and collecting rent while permitting continued tenant occupancy, repeatedly escalating enforcement without legitimate justification, and obstructing compliance—particularly in response to protected activity—constitutes an arbitrary and punitive use of governmental authority.

361.   At the time of these actions, it was clearly established that (i) government officials may not retaliate against protected First Amendment activity; (ii) the government may not deprive a property owner of the use and economic benefit of its property through arbitrary and capricious enforcement lacking a rational basis; (iii) the Due Process Clause prohibits the arbitrary exercise of governmental power that is not rationally related to a legitimate public purpose; and (iv) enforcement actions must bear a rational relationship to legitimate health and safety objectives. Defendants' conduct violated each of these clearly established principles, and the unlawfulness of such conduct would have been obvious to any reasonable official.

362.  As a direct and proximate result of Defendants' conduct, VTP has suffered substantial damages and has been deprived of its rights under the Equal Protection Clause of the Fourteenth Amendment.

WHEREFORE, VTP prays for judgment against Defendants granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

**COUNT II – 42 U.S.C. § 1983**
**FIRST AMENDMENT RETALIATION**
**UNDER COLOR OF STATE LAW**
**(AGAINST ALL DEFENDANTS)**

363.  VTP incorporates the preceding allegations as if fully set forth herein.

364.  VTP engaged in protected First Amendment activity by submitting a FOIA request seeking information about the City's enforcement practices; requesting documentation and evidence supporting alleged violations; raising concerns regarding the City's inability to substantiate its claims; raising concerns regarding Dunham's excessive enforcement activity at the Properties; and filing this lawsuit challenging the City's conduct.

365.  These activities addressed matters of public concern, including governmental transparency, code enforcement practices, and the treatment of housing providers.

366. Shortly after VTP engaged in this protected activity—and within days of submitting its FOIA request, and voicing concerns regarding the City's Building Department—Defendants undertook adverse action against VTP.

367. By way of example, within days of VTP's protected activity, the City's Building Department simultaneously issued eighteen exterior correction notices across all buildings, each scheduled for reinspection at the same date and time, imposing an immediate and substantial burden on VTP.

368. Defendants were aware of the burden such coordinated enforcement would impose. The decision to proceed in this manner was not routine, but retaliatory, and intended to penalize VTP for challenging the City's practices.

369. At the same time, Defendants refused to provide supporting documentation or evidence necessary for VTP to understand, cure, or defend against the alleged violations—despite acknowledging that such information existed.

370. Defendants also denied reasonable extension requests and refused to engage in basic coordination, further impairing VTP's ability to comply.

371. By way of another example, the day after sending a cease-and-desist letter to Dunham regarding his presence at the Properties escalating far beyond the scope of any legitimate inspection or regulatory activity, Dunham went to the Properties and red-tagged every single building. Ex. 13.

372. The timing and nature of these actions demonstrate Defendants' retaliatory motive.

373. Defendants' retaliatory intent is further evidenced by direct statements from Dunham, including instructing VTP to submit additional FOIA requests rather than providing readily available information, and making statements reflecting hostility toward VTP's efforts to challenge the City's conduct.

374. Defendants' conduct did not stop there. After VTP filed this lawsuit, Defendants escalated their actions in both scope and severity.

375. Following the filing of this action, Defendants engaged in a pattern of intensified and retaliatory enforcement, including, issuing overbroad red tags and vacate orders affecting entire buildings without evidence of imminent danger; threatening condemnation based on minor or non-emergency conditions; dramatically increasing the number of citations, hearings, and fines; imposing shifting, inconsistent, and increasingly burdensome requirements that obstructed the COC process; and continuing to withhold information necessary for compliance while penalizing VTP for alleged noncompliance.

376. Defendants also engaged in a pattern of intensified and retaliatory enforcement by arbitrarily prohibiting or effectively preventing VTP from collecting rent while units remained occupied, thereby depriving VTP of its primary revenue stream; presenting the Properties to courts, tenants, and the public in a misleading

69

and incomplete manner by characterizing conditions as property-wide and dangerous without disclosing the limited or localized nature of the alleged issues; targeting VTP's agents and property management personnel through threats of enforcement and criminal consequences, thereby interfering with VTP's ability to carry out remediation efforts; and imposing severe and compounding financial burdens by arbitrarily eliminating income while simultaneously requiring costly repairs, imposing fines, and increasing operational expenses.

377. This escalation after the filing of the lawsuit further confirms that Defendants' conduct was retaliatory in nature and intended to punish VTP for exercising its constitutional rights.

378. Such action is intended to chill or silence a person of ordinary firmness from future First Amendment activities.

379. Defendants' conduct also deviated from its treatment of similarly situated property owners, further supporting an inference of retaliatory motive.

380. A causal connection between VTP's protected activity and Defendants' adverse actions is established through temporal proximity, direct evidence of retaliatory intent, and the pattern of escalating enforcement following VTP's protected conduct.

381. Here, the temporal proximity between VTP's FOIA request regarding how the City's building violations are determined and issued, VTP vocalizing

its concerns about the City's ability to substantiate its claims regarding the Properties, serving the cease-and-desist notice, the filing of the present lawsuit, and the Defendants' adverse actions against VTP creates an inference of causation for this retaliation claim.

382. A causal link can also be shown by the disparate treatment of similarly situated individuals.

383. In addition, the fact that Defendants apply and enforce City Code differently as to VTP compared to others provides the necessary causation for a claim of retaliation.

384. The Defendants' retaliatory conduct was carried out pursuant to a policy, practice, or custom and was ratified by officials with final decision-making authority, including Dunham, Joe Meyers, and Andrew Hellenga.

385. The constitutional violations alleged herein were clearly established at the time of Defendants' conduct, and no reasonable official in Dunham's position could have believed such actions were lawful. Dunham's conduct—preventing VTP from leasing units and collecting rent while permitting continued tenant occupancy, repeatedly escalating enforcement actions without legitimate justification, obstructing compliance through shifting and undisclosed requirements, and undertaking such actions in direct response to VTP's protected activity—constitutes an arbitrary, retaliatory, and punitive use of governmental authority.

71

386. It has long been clearly established that the First Amendment prohibits government officials from taking adverse action in retaliation for protected speech, including the filing of lawsuits and requests for public records, and that the Due Process Clause forbids the arbitrary deprivation of property rights through enforcement actions that lack a rational relationship to legitimate health and safety objectives.

387. It is further clearly established that officials may not use regulatory authority as a tool to coerce, punish, or intentionally interfere with a property owner's lawful use of its property. Under these circumstances, the unlawfulness of Dunham's conduct would have been apparent to any reasonable official, and his actions fall well outside the scope of protected discretionary conduct.

388. The Defendants' conduct constitutes unlawful retaliation against VTP in violation of its rights under the First Amendment and was a moving force behind the harm suffered by VTP.

WHEREFORE, VTP prays for judgment against the Defendants granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

## COUNT III – VIOLATION OF PROCEDURAL DUE PROCESS AS GUARANTEED BY THE 5TH AND 14TH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 17 OF THE MICHIGAN CONSTITUTION (AGAINST ALL DEFENDANTS)

389. VTP incorporates the preceding allegations as if fully set forth herein.

390. The Fifth Amendment to the United States Constitution, made applicable to the State of Michigan by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

391. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

392. Article 1, § 17 of the Michigan Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law."

393. VTP has protected property and liberty interests arising from its ownership, operation, and lawful use of the Properties, including its ability to lease units, collect rent, and operate its business.

394. Due process requires that VTP be provided with adequate notice of alleged violations, a meaningful opportunity to be heard, and a fundamentally fair decision-making process before being deprived of those interests.

395. VTP prides itself on amicably working with the communities in which it owns and operates property and will address any reasonable concern that the City may have with the condition of its Properties.

396. Defendants deprived VTP of procedural due process by failing to provide adequate notice of alleged violations and by withholding the evidence necessary to understand, evaluate, and respond to those allegations.

397. The correction notices issued by the City were unconstitutionally vague, failing to identify with reasonable specificity the location, nature, or scope of the alleged violations within multi-unit buildings.

398. This lack of specificity deprived VTP of fair notice of what conduct was required to achieve compliance and rendered the notices functionally unusable.

399. Defendants compounded this deficiency by refusing to provide photographs, documentation, or other evidence supporting the alleged violations, despite acknowledging that such information existed.

400. Without access to this information, VTP was unable to meaningfully cure alleged violations or prepare a defense for the administrative hearings.

401. Defendants further undermined the fairness of the process by delaying the production of limited supporting materials until shortly before scheduled hearings, depriving VTP of a meaningful opportunity to prepare.

74

402.   Defendants also backdated violations and enforcement notices, creating a misleading record of noncompliance and further prejudicing VTP's ability to respond.

403.   Beyond deficient notice, Defendants' conduct deprived VTP of a meaningful opportunity to be heard.

404.   Defendants imposed shifting and inconsistent requirements, added new violations upon reinspection, and withheld information necessary for compliance, creating a process in which VTP could not reasonably achieve a passing result.

405.   At the same time, Defendants imposed significant consequences—including suspension of COCs, prohibition on rent collection, and the issuance of vacate orders—without affording VTP a fair and reliable process to challenge those actions.

406.   These actions had immediate and severe consequences, including the loss of rental income, the inability to operate the Properties, and the imposition of substantial financial burdens while VTP was attempting to comply.

407.   Procedural due process also requires a fair and impartial decisionmaker.

408.   As set forth above, Defendants' conduct and internal communications demonstrate bias and hostility toward VTP, including actions and statements by Defendant Dunham and other City officials reflecting a predetermined and adversarial posture.

75

409.   Despite this demonstrated bias, those same officials were responsible for making enforcement decisions and adjudicating compliance, depriving VTP of a neutral decision-making process.

410.   Defendants' actions were not isolated procedural errors, but part of a broader pattern, practice, and custom of intentionally denying VTP fair process and flagrantly deprived VTP of its constitutionally protected liberty and property interests as enumerated under the United States Constitution and the Michigan Constitution.

411.   These actions were undertaken and ratified by City officials with final decision-making authority, including Dunham, Joe Meyers, and Andrew Hellenga.

412.   The procedural due process constitutional violations alleged herein were clearly established at the time of Defendants' conduct, and no reasonable official in Dunham's position could have believed such actions were lawful.

413.   Dunham deprived VTP of its protected property interests—including the right to lease units, collect rent, and operate its business—without constitutionally adequate notice, a meaningful opportunity to be heard, or a fair and impartial decision-making process.

414.   As set forth above, Dunham enforced vague and non-specific correction notices, withheld evidence necessary to understand and cure alleged violations, imposed shifting and undisclosed requirements, and repeatedly escalated

76

enforcement actions while simultaneously imposing severe consequences, including suspension of COCs, vacate orders, and the effective elimination of VTP's revenue stream.

415.   It has long been clearly established that due process requires fair notice of alleged violations, access to the evidence necessary to respond, and a meaningful opportunity to be heard before the government deprives a property owner of the use and economic benefit of its property. It is further clearly established that enforcement actions cannot be carried out in an arbitrary, inconsistent, or fundamentally unfair manner that renders compliance unattainable.

416.   Under these circumstances—where Dunham's conduct deprived VTP of its property rights through a process that was opaque, shifting, and structurally incapable of being satisfied—the unlawfulness of such conduct would have been apparent to any reasonable official. Dunham's actions therefore fall well outside the bounds of lawful discretionary enforcement and constitute a clear violation of VTP's procedural due process rights.

417.   As a direct and proximate result of Defendants' conduct, VTP has been deprived of its constitutional right to procedural due process and has suffered substantial damages.

WHEREFORE, VTP prays for judgment against Defendants granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be

determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

## COUNT IV – VIOLATION OF SUBSTANTIVE DUE PROCESS AS GUARANTEED BY THE 5TH AND 14TH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 17 OF THE MICHIGAN CONSTITUTION (AGAINST ALL DEFENDANTS)

418. VTP incorporates the preceding allegations as if fully set forth herein.

419. The Fifth Amendment to the United States Constitution, made applicable to the State of Michigan by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

420. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

421. Article 1, § 17 of the Michigan Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law."

422. The Fourteenth Amendment protects against arbitrary and abusive exercises of governmental power, including executive action that lacks any rational basis and conduct so egregious that it shocks the conscience.

423. At all relevant times, Defendants were acting under color of state law.

424. VTP has protected property and liberty interests arising from its ownership, operation, and lawful use of the Properties, including its ability to lease units, collect rent, and operate its business.

425. Substantive due process protects against arbitrary and irrational government action that lacks a reasonable relation to a legitimate governmental purpose, as well as conduct that is so egregious that it shocks the conscience.

426. Defendants' conduct, as set forth in the preceding allegations, constitutes an arbitrary and irrational exercise of governmental power that is not reasonably related to any legitimate public health, safety, or welfare objective.

427. Defendants' actions were not isolated enforcement decisions, but part of a coordinated and escalating pattern of conduct designed to prevent VTP from operating its Properties and to impose financial and operational pressure.

428. By way of example, Defendants simultaneously issued eighteen correction notices across all buildings and scheduled all re-inspections for the same date, imposing an immediate and unmanageable burden; issued vague and unusable correction notices that failed to identify the nature or location of alleged violations; refused to provide photographs or documentation necessary to understand or cure those violations, despite acknowledging such information existed; repeatedly changed requirements during inspections and added new violations upon reinspection, making compliance structurally unattainable; imposed inconsistent and

79

increasingly burdensome permitting requirements, including requiring drawings and approvals not previously required for the same work; refused to issue TCOCs under any circumstances, even where units were safe and habitable; suspended COC based solely on alleged exterior or non-emergency conditions; and issued overbroad red tags and vacate orders affecting entire buildings without evidence of imminent danger.

429. Defendants' further compounded this conduct by prohibiting or effectively preventing VTP from collecting rent while units remained occupied, thereby eliminating VTP's primary revenue stream while simultaneously requiring costly remediation and imposing fines and penalties.

430. Defendants' actions created a sustained condition in which the Properties remained occupied but were rendered incapable of generating income, placing VTP in a position where it was required to fund ongoing operations and extensive repairs without any corresponding revenue.

431. Defendants also presented the condition of the Properties in a misleading and incomplete manner by characterizing issues as property-wide and dangerous without acknowledging that many alleged conditions were isolated, minor, or readily correctable.

432. In addition, Defendants targeted VTP's agents and property management personnel through threats of enforcement and criminal consequences,

80

interfering with VTP's ability to carry out remediation efforts and further demonstrating the punitive nature of Defendants' conduct.

433.   These actions were not undertaken for legitimate public health, safety, or welfare purposes. Rather, Defendants used their regulatory authority as a tool to exert pressure on VTP, interfere with its operations, and prevent the Properties from functioning as viable rental housing.

434.   There is no rational governmental basis for Defendants' coordinated course of conduct. In effect, Defendants engineered a system in which compliance was made unattainable, revenue was eliminated, costs were continuously increased, and VTP was penalized for conditions it was not permitted a fair opportunity to cure.

435.   This was not merely aggressive enforcement. It was a deliberate and sustained course of conduct that deprived VTP of the ability to use, operate, and preserve its property, while simultaneously imposing escalating obligations and penalties.

436.   Such conduct—knowingly placing a property owner in a position where it cannot comply, cannot operate, and cannot sustain its business, while continuing to penalize it for that condition—is arbitrary, oppressive, and so egregious that it shocks the conscience.

437.   These actions were carried out and ratified by City officials with final decision-making authority, including Dunham, Joe Meyers, and Andrew Hellenga.

81

438.   The lack of any rational relationship between Defendants' enforcement actions and a legitimate public health or safety objective is further demonstrated by the fact that those actions were directed and carried out by City officials, including Defendant Dunham, who, as set forth above, exhibited clear bias and hostility toward VTP. The involvement of a biased decisionmaker in initiating and escalating enforcement actions undermines any claim that those actions were grounded in neutral code enforcement objectives.

439.   Instead, it supports the reasonable inference that Defendants' conduct was motivated by animus and an intent to target VTP, rather than to protect the public. This is particularly true where Defendants imposed sweeping measures despite the absence of imminent, property-wide safety concerns and during a time when the availability of safe and affordable housing is critically limited.

440.   Under these circumstances, Defendants' conduct is not reasonably related to the protection of public health, safety, or welfare, but instead constitutes an arbitrary and unreasonable exercise of its police powers, undertaken with deliberate indifference to the foreseeable impact on VTP's ability to operate its Properties and sustain its business.

441.   The substantive due process constitutional violations alleged herein were clearly established at the time of Defendants' conduct, and no reasonable official in Dunham's position could have believed such actions were lawful.

82

Dunham's conduct—simultaneously preventing VTP from leasing units and collecting rent while permitting continued tenant occupancy, arbitrarily escalating enforcement actions, imposing shifting and unattainable compliance requirements, and obstructing VTP's ability to remedy alleged conditions—constitutes an egregious and irrational exercise of governmental power.

442. As set forth above, this was not routine enforcement, but a coordinated course of conduct that eliminated VTP's ability to operate its Properties while continuing to impose escalating obligations and penalties.

443. It has long been clearly established that the Due Process Clause prohibits government officials from engaging in arbitrary and capricious conduct that lacks any rational relationship to a legitimate public purpose, as well as conduct so egregious and oppressive that it "shocks the conscience." A reasonable official would have understood that using regulatory authority to render compliance unattainable, strip a property of its economic viability, and impose punitive conditions untethered to any legitimate health or safety concern is unlawful. Under these circumstances, where Dunham's actions were irrational, punitive, and destructive of VTP's property rights, the unlawfulness of his conduct would have been obvious to any reasonable official, and his actions fall well outside the scope of protected discretionary enforcement.

444. Defendants' actions violated VTP's rights under the Fourteenth Amendment to the United States Constitution and Article 1, § 17 of the Michigan Constitution.

445. As a direct and proximate result of Defendants' conduct, VTP has been deprived of its constitutionally protected property and liberty interests, suffered substantial damages, including loss of use of its Properties, loss of rental income, loss of business operations, and significant financial harm.

WHEREFORE, VTP prays for judgment against Defendants granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

### COUNT V - WRIT OF MANDAMUS/DECLARATORY JUDGMENT (AGAINST THE CITY OF YPSILANTI ONLY)

446. VTP incorporates the preceding allegations as if fully set forth herein.

447. VTP has protected property and business interests arising from its ownership, operation, and lawful use of the Properties, including its ability to lease units, collect rent, and operate its residential housing business.

448. The City, with full knowledge of these interests, previously issued COCs authorizing VTP to lease and operate the Properties.

449. Defendants have a clear legal duty under the City's ordinance and applicable law to administer the COC and TCOC process in a consistent, non-arbitrary, and non-discriminatory manner.

450. Defendants have failed to perform that duty.

451. The City's ordinance expressly authorizes the issuance of TCOCs, including in circumstances where identified conditions do not pose an imminent threat to health or safety and can be corrected within a defined period.

452. Defendants have refused to issue TCOCs to VTP as a matter of policy and practice, including where units and buildings contain no imminent health or safety violations and are otherwise suitable for occupancy.

453. Defendants' refusal to utilize TCOCs has no rational basis, is inconsistent with the City's own ordinance, and has prevented the lawful occupancy of units that could otherwise be safely occupied.

454. This refusal has caused and continues to cause substantial harm to VTP, tenants, and the availability of housing within the City.

455. Defendants have also engaged in arbitrary and inconsistent administration of the COC process by retroactively backdating COCs for certain buildings, including 721 W. Clark, 720 Green, and 721/723 Green, to a period preceding the actual determination of compliance and issuance of the certificates.

85

456. The backdating of these COCs shortens the certification period, imposes duplicative and accelerated inspection cycles, and creates unnecessary and unjustified regulatory burdens.

457. Under the City's ordinance and governing law, a COC reflects a present determination that a property is safe, healthful, and fit for occupancy at the time of issuance, and is inherently tied to the date compliance is achieved.

458. Defendants' practice of assigning retroactive certification periods is inconsistent with that framework and constitutes an arbitrary and improper exercise of municipal authority.

459. VTP has no adequate remedy at law to address Defendants' ongoing refusal to issue TCOCs and their improper administration of the COC process.

460. The City's refusal to issue TCOCs is not the result of neutral code enforcement. Rather, as detailed in the Common Allegations, Defendants have imposed shifting and inconsistent requirements; withheld information necessary for compliance; added new violations upon reinspection; and applied standards to VTP that are not applied to similarly situated properties.

461. Through this conduct, Defendants have created a process in which compliance is not meaningfully attainable, and then relied on that manufactured noncompliance as a basis to deny issuance of TCOCs.

86

462. VTP has a clear legal right to have the COC and TCOC process administered in a lawful, non-retaliatory, and non-discriminatory manner consistent with the Constitution and applicable law.

463. Defendants have a clear legal duty to administer its code enforcement and certification process in good faith and in a manner that is not arbitrary, retaliatory, or discriminatory.

464. To the extent Defendants are relying on purported code violations to deny issuance of TCOCs, it is likely that the reason is merely a pretext to deny VTP the ability to proceed with its business in retaliation for VTP's exposure of the unlawful practices of the City's building department, inconsistent enforcement of its code, the FOIA request filed by VTP regarding the same, and the filing of the present lawsuit. Accordingly, Defendants' actions are without a legal basis and not in good faith.

465. Under the All Writs Act, 28 U.S.C. § 1651, "federal courts may issue all writs necessary or appropriate in aid of their respective jurisdictions, including writs in the nature of mandamus." *Haggard v. Tennessee*, 421 F.2d 1384, 1385 (6th Cir. 1970).

466. A federal court may issue a writ of mandamus ordering a state official to enforce rights protected by federal law. *Hoffman v. Stump*, 172 F.3d 48; 1998 WL 869972 at *6 (6th Cir. 1998) (unpublished) (citing *CBS Inc. v. Young*, 522 F.2d 234

(6th Cir.1975) and *Benjamin v. Malcolm*, 803 F.2d 46 (2d Cir. 1986); *State ex rel. Skaggs v. Brunner*, 588 F. Supp. 2d 828, 833 (S.D. Ohio 2008).

467. Because VTP's claims seek enforcement of its First Amendment, Equal Protection, and Due Process rights under the Constitution of the United States, the Court may issue a writ of mandamus ordering City officials to enforce those rights.

468. "In the absence of special statutory authority, a federal court can issue writs of mandamus as ancillary to and in aid of jurisdiction otherwise vested in it. *Haggard v. State of Tenn.*, 421 F.2d 1384, 1386 (6th Cir. 1970).

469. As such, the Court may also exercise supplemental jurisdiction of a state law mandamus claim and issue a writ of mandamus under MCL 600.4411.

470. VTP further requests declaratory relief that Defendants' refusal to issue TCOCs and the backdating of COCs under the circumstances described herein is unlawful, arbitrary, and without a valid legal basis.

471. Pursuant to MCL 600.4431, VTP also seeks an award of damages and costs resulting from the City's failure to perform its legal duties in good faith.

WHEREFORE, VTP respectfully request that the Court enter an order issuing a writ of mandamus requiring Defendants to utilize and apply the TCOC process in accordance with the City's ordinance, including issuing TCOCs for buildings or units that do not present imminent threats to health or safety and are otherwise capable of lawful occupancy subject to completion of identified items; declaring that

88

Defendants' refusal to issue TCOCs under such circumstances is arbitrary, capricious, and inconsistent with the City's ordinance; ordering that the COCs issued for 721 W. Clark, 720 Green, and 721/723 Green be recognized as valid for a full two-year certification period; declaring that COCs must run from the date on which compliance is achieved and the certificate is issued, and that retroactive backdating of certification periods is improper; ordering Defendants to administer the COC process consistent with that requirement on a prospective basis; issue an award of damages, and grant such further relief as the Court determines is appropriate, including an award of costs, attorney fees, and fines, as otherwise permitted under MCL 600.4411 and MCL 600.4431 as defendants conduct has not been in good faith.

## COUNT VI – INVERSE CONDEMNATION / REGULATORY TAKING
## U.S. CONST. AMEND. V; U.S. CONST. AMEND. XIV;
## MICH. CONST. 1963, ART. 10, § 2
## (AGAINST THE CITY OF YPSILANTI ONLY)

472. VTP incorporates by reference the preceding paragraphs as though fully set forth herein.

473. The Fifth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, and Article 10, § 2 of the Michigan Constitution prohibit the taking of private property for public use without just compensation.

89

474. At all relevant times, VTP possessed protected property interests in the Properties, including the rights to possess, use, lease, operate, exclude others from, and derive income and economic benefit from the Properties.

475. Defendants, acting under color of state law, engaged in a sustained course of affirmative conduct directly aimed at the Properties.

476. As described above, Defendants' conduct included, among other things: arbitrarily suspending COCs; refusing to issue TCOCs; preventing or materially interfering with leasing and rent collection; arbitrarily issuing overbroad red tags, vacate orders, and condemnation threats; imposing excessive and unreasonable fines and penalties; and obstructing the permitting, inspection, and recertification process through shifting, arbitrary, and inconsistent requirements.

477. Defendants' actions must be considered in the aggregate, as they formed a coordinated and continuous course of conduct directed specifically at VTP and the Properties.

478. Through this conduct, Defendants substantially interfered with and effectively deprived VTP of the use and enjoyment of the Properties and their intended purpose as income-producing residential housing.

479. Defendants' actions deprived VTP of fundamental rights of ownership, including the rights to lease units, collect rent, maintain economically viable operations, and realize the value of its investment.

90

480. The Properties were rendered unable, or materially unable, to function as income-producing assets for a sustained period of time.

481. Defendants' conduct resulted in a substantial diminution in the value of the Properties and a substantial impairment of their economic viability.

482. Defendants' actions were a substantial cause of the decline in value of the Properties and the damages suffered by VTP.

483. Defendants abused their powers by engaging in affirmative actions directly aimed at the Properties that were arbitrary, excessive, inconsistent, and not reasonably related to legitimate public health or safety concerns.

484. Defendants' conduct constitutes a regulatory taking under the United States Constitution.

485. The economic impact of Defendants' actions on VTP has been severe, including the elimination or near elimination of all rental income, the imposition of substantial fines and compliance costs, and the forced expenditure of millions of dollars in remediation and operational expenses.

486. Defendants' actions have interfered with VTP's reasonable investment-backed expectations, including the expectation that the Properties could be operated as rental housing subject to consistent, evenhanded, and lawful regulatory oversight.

91

487. The character of Defendants' actions further supports a finding of a taking, as Defendants imposed targeted, property-specific burdens that effectively forced a shutdown of the Properties' economic use without compensation.

488. Defendants' conduct did not merely regulate the Properties; it went so far in restricting their use that it deprived VTP of economically viable use.

489. At a minimum, Defendants' conduct constitutes a temporary regulatory taking during the period in which VTP was deprived of the beneficial use of the Properties.

490. The injuries suffered by VTP are unique and special and differ in kind—not merely degree—from those suffered by other property owners.

491. Unlike similarly situated properties, VTP was subjected to coordinated, property-wide enforcement actions, prolonged denial of COCs, obstruction of the compliance process, and the simultaneous elimination of rental income while being required to incur escalating costs.

492. No similarly situated property owner has been subjected to the same combination of restrictions and economic deprivation imposed on VTP.

493. As a direct and proximate result of Defendants' conduct, VTP has suffered loss of use of the Properties, loss of rental income, substantial diminution in property value, and other economic damages.

494. Defendants have taken or damaged VTP's property interests for public purposes and without providing just compensation.

495. The City has failed and continues to fail to provide just compensation for the taking and damaging of VTP's property.

496. Accordingly, VTP is entitled to just compensation and all other relief permitted by law.

WHEREFORE, VTP prays for judgment against the City granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

## COUNT VII - TORTIOUS INTERFERENCE WITH A CONTRACT (AGAINST ALL DEFENDANTS)

497. VTP incorporates by reference the preceding paragraphs as though fully set forth herein.

498. At all relevant times, VTP was a party to valid and enforceable lease agreements with tenants residing at the Properties.

499. These lease agreements required tenants to pay rent to VTP in exchange for the right to occupy residential units.

500. Defendants were aware of these contractual relationships, including that tenants remained in possession of units pursuant to existing leases and that rental

income from those leases was a primary source of revenue necessary to operate, maintain, and remediate the Properties.

501. Despite that knowledge, Defendants intentionally engaged in a coordinated course of conduct designed to interfere with, disrupt, and ultimately render those contractual relationships economically unworkable.

502. Defendant Dunham, acting in his individual capacity and outside the scope of any legitimate governmental authority, personally directed, participated in, and ratified the conduct described herein. Dunham's actions were not undertaken in good faith or in furtherance of any legitimate regulatory objective, but were instead motivated by retaliation, hostility, and an intent to interfere with VTP's contractual relationships and business operations.

503. Among other things, Defendants arbitrarily suspended COCs and refused to issue TCOCs; prohibited or materially interfered with VTP's ability to lawfully lease units and collect rent; declared buildings unfit for occupancy while expressly allowing tenants to remain in possession; obstructed the remediation process through shifting and unattainable requirements, delaying VTP's ability to restore lawful operations; and created and maintained conditions under which tenants could continue to occupy their units but were not required, and in many instances were affirmatively discouraged, to pay rent.

504. Critically, the timing and structure of Defendants' actions demonstrate intent. Defendants did not require tenants to vacate the Properties, despite claiming the buildings were unfit for occupancy. Instead, Defendants allowed tenants to remain in possession while simultaneously taking actions that prevented VTP from collecting rent and enforcing lease obligations.

505. By allowing continued occupancy without rent obligations, while at the same time escalating enforcement actions and withholding the means for VTP to achieve compliance, Defendants created a predictable and unavoidable result: tenants would stop paying rent.

506. Defendants knew that tenants would not continue to pay rent under these conditions and that VTP would be unable to enforce lease obligations while COCs were suspended and enforcement actions were ongoing.

507. Defendants further understood that depriving VTP of rental income would impair VTP's ability to fund operations, perform repairs, and bring the Properties into compliance, thereby compounding the alleged violations and prolonging the enforcement process.

508. The sequence of events—allowing tenants to remain, removing the obligation to pay rent, and escalating enforcement simultaneously—was not incidental. It reflects a deliberate strategy to exert financial pressure on VTP and destabilize its business operations.

95

509. As a direct and foreseeable result of Defendants' actions, tenants ceased paying rent or were otherwise prevented from complying with their contractual obligations under their leases with VTP.

510. Defendants' conduct caused widespread and material breaches of those lease agreements.

511. Defendants' conduct, including the conduct of Defendant Dunham individually, was intentional and improper.

512. Defendants' conduct constituted wrongful acts per se, including, but not limited to arbitrary and capricious enforcement, deprivation of property rights without due process, and retaliatory and discriminatory enforcement practices.

513. Alternatively, even if Defendants' actions are characterized as lawful on their face, Defendants undertook those actions with malice and without justification, for the purpose of interfering with VTP's contractual relationships and retaliation.

514. Defendants engaged in specific, affirmative acts that corroborate its improper purpose, including targeting VTP with unprecedented, property-wide enforcement actions; withholding information necessary to cure alleged violations; imposing shifting and unattainable compliance requirements; refusing to issue TCOCs that would have allowed continued lawful operation; and ensuring that tenants remained in possession while VTP was deprived of rental income.

515. Defendants' conduct was not motivated by legitimate regulatory objectives, but by an intent to place VTP in a position where it could not sustain its business operations and retaliate for exercising its rights.

516. At all relevant times, Dunham's conduct was undertaken outside the scope of his authority as a City official and was not justified by any legitimate governmental purpose. His actions were driven by improper motives, including retaliation and the intent to impose financial harm.

517. Defendants unjustifiably instigated and induced the breach of VTP's lease agreements.

518. As a direct and proximate result of Defendants' conduct, VTP has suffered substantial damages, including but not limited to loss of rental income; loss of the benefit of its contractual relationships; increased operational and compliance costs; diminished property value; and other economic damages.

519. Defendants' interference was a substantial factor in causing these damages.

WHEREFORE, VTP prays for judgment against Defendants granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

## COUNT VIII - TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP OR EXPECTANCY
### (AGAINST ALL DEFENDANTS)

520. VTP incorporates by reference the preceding paragraphs as though fully set forth herein.

521. At all relevant times, VTP maintained valid business relationships and expectancies with current and prospective tenants, including ongoing lease negotiations, renewal opportunities with existing tenants, and the expectation of entering into future lease agreements for available and newly rehabilitated units at the Properties.

522. These relationships and expectancies were not speculative. They were based on VTP's existing tenant base, historical occupancy rates, active leasing efforts, and continued market demand for residential housing at the Properties.

523. Defendants had knowledge of these business relationships and expectancies, including that VTP operated the Properties as rental housing, relied on both current and future tenants to generate revenue, and was actively seeking to lease available units.

524. Defendants also knew that VTP's ability to attract, retain, and contract with tenants depended on its ability to lawfully lease units, maintain occupancy, and operate under valid COCs or TCOCs.

525. Dunham, acting in his individual capacity and outside the scope of any legitimate governmental authority, had direct knowledge of VTP's ongoing and prospective business relationships with tenants and personally directed, participated in, and ratified the conduct described herein. Dunham's actions were not undertaken in good faith or in furtherance of any legitimate regulatory purpose, but were instead motivated by retaliation, hostility, and an intent to interfere with and disrupt VTP's business relationships and future leasing opportunities.

526. Despite that knowledge, Defendants—including Dunham individually—intentionally engaged in a course of conduct designed to interfere with and disrupt VTP's business relationships and expectancies.

527. As set forth above, Defendants' conduct included, among other things, arbitrarily suspending COCs and refusing to issue TCOCs; prohibiting or materially interfering with VTP's ability to lease units; issuing overbroad red tags, vacate orders, and condemnation threats affecting entire buildings; imposing shifting, inconsistent, and burdensome requirements that delayed or prevented compliance; withholding information necessary for remediation; and presenting the condition of the Properties in a misleading and incomplete manner to tenants, prospective tenants, and the public.

528. The timing and nature of Defendants' actions were such that they directly interfered with VTP's ability to enter into new lease agreements and to

99

maintain ongoing leasing activity, including during periods in which VTP had units ready and available for lease but was prevented from doing so solely due to Defendants' actions.

529.   Defendants' conduct caused prospective tenants to decline to enter into lease agreements with VTP, discouraged existing tenants from renewing leases, and deterred future tenancy at the Properties.

530.   Defendants' actions also rendered VTP unable to market or lease units in the ordinary course of business, effectively eliminating its ability to generate new contractual relationships.

531.   Defendants' conduct, including the conduct of Dunham individually, was intentional and improper.

532.   Defendants conduct constituted wrongful acts per se, including arbitrary and capricious enforcement, retaliatory conduct, deprivation of constitutional rights, and actions taken without legitimate governmental justification.

533.   Alternatively, even if Defendants' actions are characterized as lawful on their face, Defendants undertook those actions with malice and without justification, for the purpose of interfering with VTP's business relationships and expectancies, and in doing so exceeded the scope of any legitimate governmental function.

100

534. Defendants engaged in specific, affirmative acts that corroborate its improper purpose, including targeting VTP for heightened and coordinated enforcement, obstructing the compliance process, refusing to provide necessary information, and denying mechanisms—such as TCOCs—that would have allowed leasing activity to continue.

535. Defendants' conduct was not motivated by legitimate regulatory objectives, but by an intent to disrupt VTP's operations and prevent the Properties from functioning as viable rental housing.

536. At all relevant times, Dunham's conduct was undertaken outside the scope of his authority as a City official and was not justified by any legitimate governmental objective. His actions were driven by improper motives, including retaliation and an intent to disrupt VTP's business operations, and therefore are not protected by governmental immunity.

537. As a direct and proximate result of Defendants' conduct, VTP has suffered substantial damages, including but not limited to loss of prospective tenants; loss of future rental income; loss of leasing opportunities; diminished occupancy rates; damage to VTP's reputation as a housing provider; and other economic losses.

538. Defendants' interference was a substantial factor in causing these damages.

101

WHEREFORE, VTP prays for judgment against Defendants granting VTP declaratory relief and awarding it actual and punitive damages in an amount to be determined at trial, together with attorney fees authorized by 42 U.S.C. § 1988, plus costs and interest.

## COUNT X - UNJUST ENRICHMENT
## (AGAINST THE CITY OF YPSILANTI ONLY)

539. VTP incorporates by reference the preceding paragraphs as though fully set forth herein.

540. As part of the conduct described above, Defendants required VTP to obtain permits and undergo inspections at an unprecedented and excessive scale.

541. In connection with those requirements, VTP paid substantial permit fees, inspection fees, and reinspection fees to the City.

542. These payments conferred a direct financial benefit on the City.

543. The City obtained these benefits through conduct that was arbitrary, unequal, and not justified by legitimate regulatory objectives.

544. As set forth above, Defendants required permits for work that did not require permits for similarly situated properties; imposed escalating and inconsistent permitting requirements, including requiring increasingly burdensome documentation for the same scope of work; repeatedly failed inspections based on shifting and newly imposed criteria; required repeated and unnecessary re-

102

inspections, each carrying additional fees, as a result of standards that were not disclosed or consistently applied.

545. Defendants' conduct created a cycle in which VTP was required to pay for permits and inspections that were unnecessary, duplicative, or the product of Defendants' own obstruction.

546. These fees would not have been incurred under a fair, consistent, and lawful enforcement process.

547. The City's retention of these funds is inequitable because the benefits were obtained through a pattern of conduct designed to obstruct compliance and impose financial pressure on VTP.

548. As a result, the City must disgorge the benefits it has unjustly retained.

549. VTP has suffered damages in an amount to be proven at trial, including the payment of improperly required permit and inspection fees.

WHEREFORE, VTP respectfully requests that this Court enter judgment in its favor and against the City, order the City to disgorge and return all permit fees, inspection fees, reinspection fees, and any other monies improperly obtained from VTP, award restitution in an amount to be determined at trial, together with pre- and post-judgment interest, costs, and any other relief permitted by law, and grant such other and further equitable and legal relief as the Court deems just and appropriate.

## **RELIEF REQUESTED**

WHEREFORE, VTP respectfully requests that this Court enter judgment in its favor and against Defendants and grant the following relief:

a. A declaration that Defendants' conduct, policies, and practices as alleged herein violate VTP's rights under the United States Constitution and the Michigan Constitution;

b. An order requiring Defendants to administer and apply the Certificate of Compliance and Temporary Certificate of Compliance process in accordance with the City's ordinance, including issuing TCOCs for buildings or units that do not present imminent threats to health or safety and are otherwise capable of lawful occupancy subject to completion of identified items;

c. An order declaring that Certificates of Compliance must run from the date compliance is achieved and the certificate is issued, and that retroactive backdating of certification periods is improper;

d. An order requiring that the Certificates of Compliance issued for 721 W. Clark, 720 Green, and 721/723 Green be recognized as valid for a full two-year certification period;

e. Compensatory damages in an amount to be determined at trial, including but not limited to lost rental income, loss of use of the Properties, and other economic damages;

f. Consequential damages resulting from the disruption and impairment of VTP's business operations;

g. Restitution and disgorgement of all fees, including permit, inspection, and reinspection fees, and any other monies improperly obtained by Defendants;

h. Just compensation to the extent Defendants' conduct is found to constitute a taking;

i. Exemplary and/or punitive damages to the extent permitted by law;

104

j.  Reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

k.  Pre-and post-judgment interest as permitted by law; and

l.  Such other and further legal and equitable relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs VTP River Woods LLC, and VTP A1 LP, hereby demand a trial by jury in the above-captioned matter.

Respectfully submitted,

BODMAN PLC

By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Debani T. Gordon Lehman (P83909)
Nashara A.L. Peart (P83078)
201 West Big Beaver, Suite 500
Troy, Michigan 48084
(248) 743-6000
*Attorneys for Plaintiffs*
jbehrendt@bodmanlaw.com
dgordon@bodmanlaw.com
npeart@bodmanlaw.com

April 17, 2026